IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALBERT BUCHTAN, MELINDA BUCHTAN, STEPHEN PRATT, CRYSTAL PRATT, DANIEL SMITH, JOEY LYNN SMITH, JACKIE SHUPPE, and SCOTT SHUPPE, <br><br> Plaintiffs, <br><br> v. <br><br> GREENE COUNTY CHILDREN AND YOUTH SERVICES, BETH BOOKER, and JACQUELYN WIGGINS, <br><br> Defendants. | CIVIL DIVISION <br><br> NO. 2:25-CV-01728-DSC <br><br> Judge Nora Barry Fischer <br><br> JURY TRIAL DEMANDED |

## SECOND AMENDED COMPLAINT

Plaintiffs Albert Buchtan, Melinda Buchtan, Stephen Pratt, Crystal Pratt, Daniel Smith, Joey Lynn Smith, Jackie Shuppe, and Scott Shuppe, by and through their respective undersigned counsel, hereby file their Second Amended Complaint against Defendants Greene County Children and Youth Services, Beth Booker, and Jacquelyn Wiggins, and aver as follows:

### PARTIES

1.  Albert Buchtan and Melinda Buchtan (the "Buchtans"), husband and wife, are natural persons domiciled in Greene County, Pennsylvania. Mr. Buchtan is a business owner and community leader. Mrs. Buchtan is a first-grade teacher in Greene County.

2.  Stephen Pratt and Crystal Pratt (the "Pratts"), husband and wife, are natural persons domiciled in Greene County, Pennsylvania. Mr. Pratt is a business owner and community leader. Mrs. Pratt is a fifth-grade teacher in Greene County.

3.  Daniel Smith and Joey Lynn Smith (the "Smiths"), husband and wife, are natural

1

persons domiciled in Greene County, Pennsylvania. Mr. Smith is a business owner and community leader. Mrs. Smith has been a middle school math teacher in Greene County for approximately twenty (20) years.

4. Jackie Shuppe and Scott Shuppe (the "Shuppes"), husband and wife, are natural persons domiciled in Greene County, Pennsylvania. Mrs. Shuppe works in human resources. Mr. Shuppe works at the Iron Senergy coal mine in Greene County.

5. Greene County Children and Youth Services ("GCCYS") is an agency of Greene County established pursuant to section 405 of the act of June 24, 1937.

6. Beth Booker is a natural person domiciled in Greene County, Pennsylvania. Ms. Booker was the Administrator of GCCYS at all times relevant to this Complaint.

7. Jacquelyn Wiggins is a natural person domiciled in Greene County, Pennsylvania. Ms. Wiggins was an employee of GCCYS at all times relevant to this Complaint.

## JURISDICTION AND VENUE

8. Paragraphs 1-7 of the Second Amended Complaint are incorporated by reference as if set forth fully herein.

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

10. This Court has personal jurisdiction over GCCYS pursuant to 42 Pa. C.S. § 5301(a)(3) because GCCYS carries on a continuous and systematic part of its general business in Pennsylvania.

11. This Court has personal jurisdiction over Ms. Booker and Ms. Wiggins pursuant to 42 Pa. C.S. § 5301(a)(1) because Ms. Booker and Ms. Wiggins are domiciled in Pennsylvania.

12. This Court has venue pursuant to 28 U.S.C. § 1391(b)(1) because Ms. Booker and Ms. Wiggins reside in this judicial district and all defendants are residents of the Commonwealth of Pennsylvania. This Court also has venue pursuant to 28 U.S.C. § 1392(b)(1) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

13. Paragraphs 1-12 of the Second Amended Complaint are incorporated by reference as if set forth fully herein.

**A.  Plaintiff School Board Members Inquire into School District Finances**

14. The Board of the Carmichaels Area School District (the "School Board") is the governing body for the Carmichaels Area School District in Greene County, Pennsylvania (the "School District").

15. Mr. Pratt was elected to the School Board in November 2021 for a four-year term.

16. Mr. Buchtan was elected to the School Board in November 2023 for a four-year term.

17. Mr. Smith was appointed to the School Board in January 2024 following the resignation of another board member. He was elected in November 2025 for a four-year term.

18. Mrs. Shuppe was elected to the School Board in November 2023 for a four-year term.

19. In December 2023 and into early 2024, members of the School Board, led by Mr. Buchtan and Mr. Pratt, along with Mr. Smith and Mrs. Shuppe, began making detailed inquiries into the School District's budget and finances.

20. The School Board members leading these inquiries almost immediately found themselves in conflict with the School District's business manager, who they believed was limiting their access to financial records in order to conceal mistakes in financial reports and the extent of the School District's potential budgetary shortfall.

21. As these School Board members continued their inquiries, their conflict with the School District's business manager escalated to the point that she ceased attending the School Board's public meetings. The School Board contemporaneously began taking steps toward her termination.

**B.   Plaintiffs are Subject to Identical False Child Endangerment Reports Immediately after Plaintiff School Board Members Vote to Take Adverse Employment Action Against the School District Business Manager**

22. On April 5, 2024, within days of the School Board initiating adverse employment action against the School District's business manager, GCCYS received reports alleging that those School Board members, and their spouses, who had minor children enrolled in the School District and who had supported adverse action as to the business manager (including the Buchtans, Pratts, Smiths, and Shuppes) would use cocaine in the presence of their minor children (the "Reports").

23. Defendants knew or should have known upon receipt of the Reports that they were false and retaliatory. Plaintiffs are informed and believe that Defendants were told by the School District's resource officer that same day that each of the minor children named in the Reports belonged to a School Board member. Plaintiffs are further informed and believe that Defendants were aware of the School Board's inquiries into the School District's budget and finances and its related conflict with the School District's business manager. Those matters were discussed in agendas and meeting minutes published on the School District's website and/or public meetings archived on YouTube.

4

24. In addition, the School District's business manager is married to the former deputy administrator of GCCYS, who at the relevant time was leading a sister agency also under the umbrella of the Greene County Commission. The Reports also failed to identify pre-school-age children of certain Plaintiffs, indicating that they were submitted by an individual who did not have personal knowledge but rather had access to the School District's records. Notably, the School District's business manager had been seen on video camera entering the School District's building after-hours and examining documents at or around this same time.

**C.    Defendants' Investigation of the False Child Endangerment Reports**

25. Despite having reason to doubt the veracity of the Reports, GCCYS appeared at the Buchtans' and Pratts' homes on April 9, 2024 to investigate the complaints. On the same day, GCCYS also appeared at the Smiths' and Shuppes' homes to investigate the complaints.

**1.    The Buchtans**

26. When GCCYS arrived at the Buchtans' home on April 9, 2024, Mr. and Mrs. Buchtan were at home with their 12-year-old daughter.

27. Ms. Wiggins and another GCCYS employee, whose identity is currently unknown to Plaintiffs, entered the family garage without permission, where they found Mr. Buchtan and accused him of using and selling cocaine. Mr. Buchtan called Mrs. Buchtan into the garage to witness his discussions with Ms. Wiggins and the other GCCYS employee.

28. Ms. Wiggins and the other GCCYS employee further threatened Mr. Buchtan that he would go to jail, and his children could be removed if he did not submit to a drug test. Mr. Buchtan was then subjected to two drug tests, both of which came back negative.

29. Ms. Wiggins and the other GCCYS employee also took the Buchtans' 12-year-old daughter to the family living room for a private interview, during which they pressured her to

report being malnourished and having witnessed drug activity. Ms. Wiggins and the other GCCYS employee refused to allow the Buchtans to accompany their 12-year old daughter and demanded that the Buchtans call their other daughter home from softball practice for a similar interview.

30. Ms. Wiggins and/or the other GCCYS employee asked the Buchtans for the location of their refrigerators and inspected the refrigerator in the garage in the Buchtans' presence. Upon information and belief, Ms. Wiggins and GCCYS performed a further investigation of the Buchtans' home and took photographs while out of the presence of the Buchtans.

31. Around this time, Mr. Buchtan called Greene County Commissioner Besty McClure to inform her that he was being subject to an illegal and retaliatory drug test and investigation by GCCYS, to which she responded with disbelief.

32. Shortly thereafter, Ms. Wiggins received a telephone call and immediately then informed the Buchtans that they would be leaving without speaking to the Buchtans' other daughter, who was away from the home at the time, as they knew what had happened. The other GCCYS casework stated that she knew something was not right as soon as they pulled up to the Buchtans' home.

33. The Buchtans did not consent to the search or photographing of their home, or the interview of their 12-year old daughter.

   **2.  The Pratts**

34. When GCCYS arrived at the Pratts' home on April 9, 2024, Mrs. Pratt was home alone. The GCCYS caseworker, known only as "Chris," asked Mrs. Pratt if they had food and running water, took pictures of the Pratts' kitchen and son's bedroom, and informed Mrs. Pratt that he would need to return the following day to perform a drug test of Mr. Pratt.

35. When GCCYS returned to the Pratts' home on April 10, 2024, the caseworker demanded to see the Pratts' son but said that they would no longer be requiring him to submit to a private interview or Mr. Pratt to submit to a drug test. "Chris" then apologized to Mrs. Pratt, telling her that the case was unfounded, and left the home.

36. The Pratts did not consent to the search or photographing of their home.

**3.     The Smiths**

37. When two (2) representatives of GCCYS (including Ms. Wiggins) arrived at the Smiths' home on April 9, 2024, Mr. Smith was at the School District for a meeting and therefore not home. GCCYS did speak with Mrs. Smith at the home.

38. GCCYS was accusatory, demanding, and confrontational for an interview that lasted more than sixty (60) minutes. Specifically, Mrs. Smith was told by GCCYS that Mr. Smith needed to immediately submit to a drug test, and that if he did not, it would be considered an automatic failure, and the Smiths' children would be removed from the home.

39. Mrs. Smith explained that she was a long-time teacher at the School District, and through her experience with GCCYS as a teacher, she never experienced GCCYS acting in such a demanding and accusatory manner.

40. By the time that GCCYS left the Smiths' home, one of the GCCYS' representatives had apologized, was on the verge of tears, and stated that she did not know why GCCYS was even pursuing the matter.

41. The Smiths did not consent to the search of their home.

**4.     The Shuppes**

42. On April 9, 2024, one (1) representative of GCCYS also arrived at the Shuppes' home. Mrs. Shuppe was working at the time and not home. Mr. Shuppe was home with their two

(2) children – who were two (2) and six (6) years old at the time. GCCYS told Mr. Shuppe that the investigation was related to alleged substance abuse by Mrs. Shuppe.

43. Mrs. Shuppe returned from work, and after learning that GCCYS was at Mr. Buchtan's home, she drove to Mr. Buchtan's home, who lives nearby. Mrs. Shuppe was told by GCCYS that she had to submit to a drug test, and that if she did not, it would be considered a positive test and her children removed from the home.

44. On the following days, the GCCYS caseworker returned to the Shuppes' home, confirmed that the Shuppes had food and running water and took pictures of the bedrooms belonging to their minor children. The GCCYS caseworker also asked for photographs of the children. GCCYS stated at that time that it had no Report or record related to the Shuppes' non-school aged child.

45. The Shuppes did not consent to the search or photographing of their home.

46. On April 12, 2024, Mrs. Shuppe spoke to Beth Booker by telephone. Mrs. Booker told Mrs. Shuppe that all four school members were listed on the same Report, and that it was very "weird" that four people from the same place were identified in the same Report with more significant detail than is typical. Mrs. Booker referenced on two (2) separate occasions that the initial phone call wherein the Report was made was "weird."

47. On April 12, 2024, Mrs. Shuppe also spoke to "John" who identified himself as the regional director of CYS. Mrs. Shuppe requested that the photographs of her children's bedrooms be removed from GCCYS' database given the strong inference that the initial Reports themselves appeared to emanate from someone at GCCYS or connected with GCCYS in some capacity. After explaining the situation further to John, John stated that he would immediately secure the Reports

of all Plaintiffs so that only a limited number of people (including Beth Booker) would be able to access the information going forward.

**D.    Plaintiffs' Demand that Defendants Cease and Desist and Preserve Documents**

48.    On April 16, 2024, both Mr. Smith and Mrs. Shuppe sent GCCYS a letter advising that a false report had been submitted against them and requested a copy of their respective Reports pursuant to 23 Pa. C.S. § 6340(b).

49.    On April 19, 2024, the Buchtans and Pratts sent GCCYS a letter demanding that it cease and desist any further investigation into the Reports, provide copies of their investigation files, and preserve all evidence related to the investigations.

50.    During this time period, Mr. Smith was also attempting to get additional information on the submission of the false Reports. One of the people he spoke to was Jared Edgreen, who was and is the Chairman for the Greene County Board of Commissioners, which is ultimately responsible for the daily activities and administration of GCCYS.

51.    On April 25, 2024, after asking Mr. Smith how his family was doing during this troubling ordeal, Mr. Edgreen texted Mr. Smith and stated, "I hate that ww [sic] are so limited on what we can do, and to top it off, what we did know I couldn't tell you."

52.    To this day, Mr. Edgreen has not told Mr. Smith what he did know about the Reports or the initial call to GCCYS.

53.    Shortly after the false Reports were filed, GCCYS closed its investigations into the Plaintiffs without any finding of child endangerment.

54.    Upon information and belief, despite knowing that the reports were false, GCCYS has destroyed its records related to the investigations into the Plaintiffs without notice or opportunity to the Plaintiffs to make copies of the same.

**COUNT I – FIRST AMENDMENT RETALIATION**

55. Paragraphs 1-54 of the Second Amended Complaint are incorporated by reference as if set forth fully herein.

56. Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

57. Defendants at all times relevant to this Second Amended Complaint were persons acting under color of state law for purposes of section 1983. Plaintiffs are informed and believe that Defendants were acting pursuant to a policy or custom established by the GCCYS administrator, Ms. Booker, for the investigation of reports.

58. Plaintiffs at all times relevant to this Second Amended Complaint were citizens of the United States or persons within the jurisdiction thereof.

59. Under the First Amendment to the United States Constitution, as incorporated to the states through the Fourteenth Amendment to the United States Constitution, Plaintiffs are guaranteed the right to freedom of speech.

60. Mr. Buchtan, Mr. Pratt, Mr. Smith, and Mrs. Shuppe engaged in speech protected by the First Amendment where they advocated for, voted to take, and/or took employment action adverse to the School District's business manager in their capacities as members of the School Board.

61. Plaintiffs are informed and believe that Defendants had actual knowledge of the protected First Amendment activity for the reasons pleaded above.

62. Defendants retaliated against Plaintiffs for their protected First Amendment activity by subjecting Plaintiffs to a sham child-endangerment investigation, the threat and/or performance of which would be sufficient to deter persons of ordinary firmness from exercising their First Amendment rights.

63. A causal nexus exists between Plaintiffs' protected First Amendment activity and the submission and/or investigation of the Reports where the Reports were submitted within days of the Plaintiff School Board Members' protected First Amendment activity and targeted each School Board member who acted accordingly and their spouses (with the exception, however, of a single School Board member who did not have children in the School District at the time).

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly and severally, in an amount in excess of $1,000,000.00, together with such further relief as the Court deems just and proper, including punitive damages, costs, interest, and delay damages.

### COUNT II – FOURTH AMENDMENT SEARCH AND SEIZURE

64. Paragraphs 1-63 of the Second Amended Complaint are incorporated by reference as if set forth fully herein.

65. Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

66. Defendants at all times relevant to this Second Amended Complaint were persons acting under color of state law for purposes of section 1983. Plaintiffs are informed and believe that Defendants were acting pursuant to a policy or custom set forth in a Urine-Drug Screening Policy created on or about November 14, 2022.

67. Plaintiffs at all times relevant to this First Amended Complaint were citizens of the United States or persons within the jurisdiction thereof.

68. Under the Fourth Amendment to the United States Constitution, as incorporated to the states through the Fourteenth Amendment to the United States Constitution, Plaintiffs are guaranteed the right to be free from unreasonable searches and seizures.

69. Plaintiffs were subjected to searches and/or photographing of their homes by Defendants in the course of the investigation of the false Reports. Additionally, Mr. Buchtan was subjected to a search where he was forced to take a warrantless drug test. *Smith v. Northampton Cnty.*, No. 22-3788, 2023 WL 1767765, at *6 (E.D. Pa. Feb. 3, 2023). Ms. Wiggins and the other GCCYS employee threatened Mr. Buchtan with jail time and removing his children from the home if he did not comply with their demands to take the drug test. Mrs. Smith was similarly told by GCCYS that Mr. Smith's refusal to submit to a warrantless drug test would be deemed an automatic failure authorizing the removal of the Smiths' children from their home.

70. As pleaded above, none of the Plaintiffs consented to the searches or photographing of their homes. Nor did Mr. Buchtan consent to the drug test imposed upon him by Defendants.

71. The searches were unreasonable where the Reports were submitted within days of Plaintiffs' protected First Amendment activity and targeted each School Board member who acted accordingly and their spouses (with the exception, however, of a single School Board member who did not have children in the School District at the time) and where, moreover, each Report

contained identical allegations of illegal drug use. Additionally, in the case of the warrantless drug test required of Mr. Buchtan, the Pennsylvania Supreme Court has expressly held that the Child Protective Services Law does not include the authority to obtain an involuntary urine sample from the subject of the investigation. *In the Interest of D.R.*, 659 Pa. 319, 232 A.3d 547 (2020).

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly and severally, in an amount in excess of $1,000,000.00, together with such further relief as the Court deems just and proper, including punitive damages, costs, interest, and delay damages.

Respectfully submitted,

Dated: January 28, 2026

By: */s/ Francesca Iovino*
Erin Lucas Hamilton, Esquire
Pa. ID No. 93852
Joseph V. Schaeffer, Esquire
Pa. ID No. 323256
Francesca Iovino, Esquire
Pa. ID. No. 324229

BABST, CALLAND, CLEMENTS
and ZOMNIR, P.C.
Two Gateway Center, 8th Floor
603 Stanwix Street
Pittsburgh, PA 15222

(412) 394-5400– Phone
(412) 394-6576 – Fax
ehamilton@babstcalland.com
jschaeffer@babstcalland.com
fiovino@babstcalland.com

*Counsel for Plaintiffs Albert Buchtan, Melinda Buchtan, Stephen Pratt, and Crystal Pratt*

-and-

METZ LEWIS BRODMAN MUST O'KEEFE LLC

*/s/ Joshua D. Baker*
Joshua D. Baker (PA 308243)

444 Liberty Avenue, Suite 2100
Pittsburgh, PA 15222
Phone: (412) 918-1100
Fax: (412) 918-1199
jbaker@metzlewis.com

*Counsel for Plaintiffs Daniel Smith, Joey Lynn Smith, Jackie Shuppe, and Scott Shuppe*

14