IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALBERT BUCHTAN et al., | ) | CIVIL DIVISION |
| | ) | |
| Plaintiffs, | ) | NO. 2:25-CV-01728-NBF |
| | ) | |
| v. | ) | Judge Nora Barry Fischer |
| | ) | |
| GREENE COUNTY CHILDREN AND | ) | |
| YOUTH SERVICES et al., | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

**RESPONSE IN OPPOSITION TO
MOTION TO DISMISS SECOND AMENDED COMPLAINT**

Plaintiffs are four current or former members of the Board of the Carmichaels Area School District and their spouses. Each is an upstanding member of the community. They seek redress against Defendants for subjecting them to baseless and malicious child endangerment investigations in which their homes were searched, their children were threatened with removal, and one Plaintiff was subjected to two warrantless drug tests. Because Plaintiffs' Second Amended Complaint plausibly alleges that these acts were retaliatory in violation of the First Amendment and unreasonable in violation of the Fourth Amendment, the Court should deny Defendants' Motion to Dismiss the Second Amended Complaint.

**BACKGROUND**

**A.      Factual Allegations**

Albert Buchtan, Stephen Pratt, Daniel Smith, and Jackie Shuppe (the "School Board Plaintiffs") are current and former members of the Board of the Carmichaels Area School District in Greene County, Pennsylvania. (ECF No. 14 at ¶¶ 1-4, 14-18). Melinda Buchtan, Crystal Pratt, Joey Lynn Smith, and Scott Shuppe are their spouses (together with the School Board Plaintiffs, the "Plaintiffs"). (*Id.* at ¶¶ 1-4). Beginning in November 2023, the School Board Plaintiffs began

making detailed inquiries into the School District's budget and finances. (*Id.* at ¶ 19). Almost immediately, the School Board Plaintiffs found themselves in conflict with the School District's business manager, who they believed was limiting their access to financial records in order to conceal mistakes in financial reports and the extent of the School District's potential budgetary shortfall. (*Id.* at ¶ 20). This conflict soon escalated to the point where the School District's business manager ceased attending the School Board's public meetings and the School Board began taking steps toward her termination. (*Id.* at ¶ 21). Each of the School Board Plaintiffs supported this adverse employment action. (*Id.* at ¶¶ 21-22).

On April 5, 2024, within days of the School Board initiating adverse employment action against the School District's business manager, Greene County Children and Youth Services ("GCCYS") received child endangerment reports alleging that Plaintiffs would use cocaine in the presence of their minor children (the "Reports"). (*Id.* at ¶ 22). Defendants knew or should have known that the Reports were false and retaliatory. (*Id.* at ¶ 23). There is no question that Defendants knew that each of the minor children named in the Reports belonged to members of the School Board; the School District's resource officer informed Defendants of that fact the day of the Reports' submission. (*Id.*).

Additionally, the School Board Plaintiffs' conflict with the School District's business manager was a matter of public knowledge and concern. (*Id.*). Defendants also were particularly likely to know of the conflict because the School District's business manager was married to GCCYS's former deputy administrator, who at the time of the Reports' submission was leading a sister agency also under the umbrella of the Greene County Commission. (*See id.* at ¶ 24). Moreover, Beth Booker, the GCCYS Administrator during this period, described the initial phone call submitting the Reports as "weird" and likewise noted that it was "weird" that four people from

the same place were identified in the same Reports with more detail than typical. (*Id.* at ¶ 46). Other GCCYS representatives expressed misgivings about the Reports as well, leading several to later acknowledge that the investigations were unfounded and apologize on the verge of tears. (*Id.* at ¶¶ 32, 35 & 40).

Despite having reason to dismiss the Reports, GCCYS appeared at Plaintiffs' homes on April 9, 2024 to investigate the complaints. When GCCYS arrived at the Buchtans' home, both Buchtans were at home with their 12-year-old daughter. (*Id.* at ¶ 26). Jacquelyn Wiggins and another GCCYS representative entered the family garage without permission, where they found Mr. Buchtan and accused him of using and selling cocaine. (*Id.* at ¶ 27). After threatening Mr. Buchtan with arrest and removal of his children, the GCCYS representatives subjected him to two drug tests—both of which came back negative. (*Id.* at ¶ 28). Meanwhile, the GCCYS representatives entered the main part of the Buchtans' home, where they subjected the Buchtans' 12-year-old daughter to a private interview in which they pressured her to report being malnourished and having witnessed drug activity. (*Id.* at ¶ 29). The GCCYS representatives also inspected the Buchtans' refrigerators and, upon information and belief, performed a further investigation of the Buchtans' home and took photographs while outside the Buchtans' presence. (*Id.* at ¶ 30). Though initially demanding that the Buchtans have their other daughter return home for an interview, the GCCYS representatives abruptly abandoned their investigation after receiving a telephone call from an unknown individual, stating that they knew something was not right as soon as they arrived at the Buchtans' home. (*Id.* at ¶ 32). The Buchtans did not consent to the search or photographing of their home or the interview of their 12-year-old daughter. (*Id.* at ¶ 33). Nor did Mr. Buchtan consent to the warrantless drug tests. (*Id.* at ¶ 70).

When GCCYS arrived at the Pratts' home, Mrs. Pratt was home alone. (*Id.* at ¶ 34). The GCCYS representative, who identified himself as "Chris," asked Mrs. Pratt if they had food and running water, took pictures of the Pratts' kitchen and the Pratts' son's bedroom, and informed Mrs. Pratt that he would be returning the following day to perform a drug test of Mr. Pratt. (*Id.*) When GCCYS returned to the Pratts' home the next day, the GCCYS representative insisted on seeing the Pratts' son but stated that he would not require the son to submit to a private interview or require Mr. Pratt to submit to a drug test. (*Id.* at ¶ 35). The GCCYS representative then apologized to Mrs. Pratt upon leaving the home, telling her that the Report was unfounded. (*Id.*). The Pratts did not consent to the search or photographing of their home. (*Id.* at ¶ 36).

When GCCYS arrived at the Smiths' home, Mrs. Smith was home alone. (*Id.* at ¶ 37). Over the course of an interview that lasted more than 60 minutes, Ms. Wiggins and the other GCCYS representative were accusatory and demanding, telling Mrs. Smith that the Smiths' children would be removed from the home if Mr. Smith did not immediately submit to a drug test. (*Id.* at ¶ 38). By the time that GCCYS left the Smiths' home, however, one of the GCCYS representatives was on the verge of tears and apologized, stating that she did not know why GCCYS was even pursuing the matter. (*Id.* at ¶ 40). Mrs. Smith, a long-time teacher in the area who had prior experience with GCCYS as a result, had never before witnessed GCCYS act in such a demanding and accusatory manner. (*Id.* at ¶ 39). The Smiths did not consent to the search of their home. (*Id.* at ¶ 41).

When GCCYS arrived at the Shuppes' home, Mr. Shuppe was home with the Shuppes' two children—who were then two and six years old. (*Id.* at ¶ 42). Notably, the Report did not identify the Shuppes' two-year-old child, indicating that the person submitting it lacked personal knowledge to support the allegations set forth therein. (*Id.* at ¶¶ 24 & 42). Meanwhile, Mrs. Shuppe had driven to the Buchtans' home upon learning that GCCYS was at their residence. (*Id.* at ¶ 43).

4

While at the Buchtans, Mrs. Shuppe was told by GCCYS that her children would be removed from the Shuppes' home if she did not submit to a drug test. (*Id.*). Though GCCYS left the Shuppes' home on April 9, 2024, it returned on the following days to confirm that the Shuppes had food and running water and to take pictures of the Shuppes' children's bedrooms. (*Id.* at ¶ 44). GCCYS also asked for photographs of the Shuppes' children. (*Id.*). The Shuppes did not consent to the search or photographing of their home. (*Id.* at ¶ 45).

Following the searches of their homes, several Plaintiffs attempted to uncover more information about the Reports. Mrs. Shuppe spoke with Ms. Booker by telephone on April 12, 2024, but Ms. Booker would state only that the phone call submitting the Reports was "weird," as was the listing of all four School Board Plaintiffs in the same Report. (*Id.* at ¶ 46). Mr. Smith similarly exchanged text messages with Greene County Commissioner Jared Edgreen on April 25, 2024, but Mr. Edgreen would only say ominously, "I hate that ww [sic] are so limited on what we can do, and to top it off, what we did know I couldn't tell you." (*Id.* at ¶ 51).

In the meantime, Plaintiffs retained counsel. The Smiths and Shuppes' counsel sent GCCYS a letter on April 16, 2024, advising that that Reports were false and requesting a copy of the reports pursuant to 23 Pa. C.S. § 6340(b). (*Id.* at ¶ 48). The Buchtans and Pratts' counsel sent GCCYS a similar letter on April 19, 2024, demanding that GCCYS cease any further investigation into the Reports, provide copies of its investigative files, and preserve all evidence related to the investigations. (*Id.* at ¶ 49). GCCYS subsequently advised that it had closed its investigations into Plaintiffs without any finding of child endangerment. (*Id.* at ¶ 53). Despite Plaintiffs' express preservation demand, however, Plaintiffs are informed and believe that GCCYS has destroyed its records related to its investigations of the Reports without notice or opportunity to Plaintiffs to make copies of the same. (*Id.* at ¶ 54).

**B.      Procedural History**

The Buchtans and Pratts commenced this action in the Court of Common Pleas of Greene County, Pennsylvania, on April 7, 2025 with the filing of a praecipe for writ of summons. The Buchtans and Pratts then filed a complaint against Defendants in the Court of Common Pleas on October 27, 2025, in which they asserted claims for First Amendment and Fourth Amendment violations. (ECF No. 1-2). Defendants subsequently removed this action to this Court. (ECF No. 1). A first amended complaint joined the Smiths and Shuppes to this action as plaintiffs and responded to certain alleged deficiencies raised by Defendants during a meet-and-confer. (ECF No. 8). A second amended complaint addressed yet other alleged deficiencies raised by Defendants during a second meet-and-confer. (ECF No. 14). Defendants now have moved to dismiss the Second Amended Complaint in part for, among other things, failure to state a claim and qualified immunity.[1] (ECF No. 15).

## ARGUMENT

**A.      Legal Standard**

Courts within the Third Circuit are to evaluate the sufficiency of a plaintiff's complaint according to a three-step test. "First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify the allegations that, because they are no more than conclusions, are not entitled to the presumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (cleaned up; internal citations omitted). "A claim has facial plausibility when the plaintiff

---

[1] As noted below, the Motion to Dismiss does not request the dismissal of the Buchtans' Fourth Amendment claims against Ms. Wiggins.

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. The plausibility standard "does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008) (cleaned up; quoting, in part, *Bell Atlantic v. Twombly*, 550 U.S. 544, 545 (2007)).

**B.    The Motion to Dismiss should be denied.**[2]

Plaintiffs have pleaded claims for First and Fourth Amendment violations pursuant to 42 U.S.C. § 1983, which provides a statutory cause of action for certain violations of constitutional rights. For Plaintiffs to state a claim under § 1983, they must plead two essential elements: "(1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Shneyder v. Smith*, 652 F.3d 313, 319 (3d Cir. 2011). Defendants do not contest that they are "persons acting under color of state law." (*See, generally*, ECF No. 16). They instead contend that Plaintiffs have not stated claims for First Amendment violations, that Ms. Booker and Ms. Wiggins alternatively should be granted qualified immunity on the First Amendment claims, that Plaintiffs have not stated claims for Fourth Amendment

---

[2] Plaintiffs do not oppose the Motion to Dismiss to the extent that it seeks to strike the demand for a specific amount of damages in the *ad damnum* clause under Local Rule of Civil Procedure 8; Plaintiffs acknowledge that the specific amount should have been removed when the complaint was amended after removal, and their counsel apologize for the oversight. Plaintiffs also do not oppose the Motion to Dismiss to the extent that it seeks the dismissal of the Pratts' and Shuppes' First and Fourth Amendment claims against Ms. Wiggins only.

violations against Ms. Booker or Ms. Wiggins (with the exception of the Buchtans' Fourth Amendment claims against Ms. Wiggins), and that Plaintiffs have not stated a claim against GCCYS under *Monell*. (*See, generally, id.*). Defendants are incorrect.

1. **Plaintiffs have pleaded sufficient facts to state a plausible claim for First Amendment retaliation**.

To state a claim for First Amendment retaliation, Plaintiffs must show: "(1) that they engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." *Lauren w. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 268 (3d Cir. 2007). "The Third Circuit has generally required a plaintiff to establish that the defendant is aware of the protected activity in order to prevail on a First Amendment retaliation claim."[3] *Price v. City of Phila.*, 239 F. Supp. 3d 876, 890 (E.D. Pa. 2017). This typically "presents a question of fact for the jury," *McGreevy v. Stroup*, 413 F.3d 359, 364 (3d Cir. 2005), and at the motion to dismiss stage, Plaintiffs "must only produce some evidence,

---

[3] The cases imposing this requirement generally involve First Amendment retaliation claims brought by public employees, which apply a different two-part test that considers whether "(1) the activity in question is protected by the First Amendment and (2) the protected activity was a substantial factor in the alleged retaliatory action." *See Falco v. Zimmer*, 767 F. App'x 288, 298 (3d Cir. 2019) (distinguishing First Amendment retaliation cases brought by public employees from those brought by private citizens). Nearly all the cases cited by Defendants for the "actual knowledge" requirement fall into this category or a similar category of retaliation claims arising under Title VII of the Civil Rights Act of 1964. *See Zucal v. Cnty. of Lehigh*, 760 F. Supp. 3d 290 (E.D. Pa. 2024) (First Amendment and Title VII employment retaliation); *Ambrose v. Twp. of Robinson*, 303 F.3d 488 (3d Cir. 2002) (First Amendment employment retaliation); *Eskridge v. Phila. Housing Auth.*, 722 F. App'x 296 (3d Cir. 2018) (Title VII employment retaliation); *Moore v. City of Phila.*, 461 F.3d 331 (3d Cir. 2006) (Title VII employment retaliation). The exceptions are *Weil v. White*, 629 F. App'x 262 (3d Cir. 2015) (*per curiam*), a non-binding per curiam Third Circuit decision litigated by a *pro se* appellant, and *Travillion v. Harry*, No. 4:23-cv-01335, 2025 WL 1401657 (M.D. Pa. May 14, 2025), an unpublished Middle District decision in which the *pro se* litigant did not oppose summary judgment. The Court need not resolve whether the "actual knowledge" requirement applies here because Plaintiffs satisfy it in any event.

direct or circumstantial, of this element that is 'enough to raise a right to relief above the speculative level.'" *Falco v. Zimmer*, 767 F. App'x 288, 310 (3d Cir. 2019) (quoting, in part, *Twombly*, 550 U.S. at 555).

> a.   **Plaintiffs have pleaded sufficient facts from which the Court may reasonably infer that Defendants had actual knowledge of Plaintiffs' protected First Amendment activity**.

In their Motion to Dismiss, Defendants argue that Plaintiffs' First Amendment retaliation claim fails because Plaintiffs have not adequately pleaded that Defendants had actual knowledge of the underlying protected activity. (ECF No. 16, 7-10). Defendants contend that it is insufficient to allege that they "knew or should have known" that the Reports were false and retaliatory. (*Id.* at 8 (citing ECF No. 14 at ¶ 22)). Instead, Defendants assert that Plaintiffs were required to plead that Defendants "actually knew of Plaintiffs' protected speech." (ECF No. 16, 10 (emphasis omitted)). These arguments both misstate Plaintiffs' pleading requirements and overlook the significance of the factual allegations in the Second Amended Complaint.

To start, Defendants overlook that Plaintiffs expressly pleaded that "Defendants had actual knowledge of [Plaintiffs'] protected First Amendment activity …." (ECF No. 14 at ¶ 61). At the pleadings stage, Plaintiffs need only plead facts that, whether in the form of direct or circumstantial evidence, raise that allegation above the level of speculation to plausibility. *Falco*, 767 F. App'x at 310. And, here, Plaintiffs have done so with at least five specific factual allegations:

- The protected activity related to School District finances that were matters of public knowledge and concern, (*Id.* at ¶ 19-22);
- The protected activity related to the spouse of a former GCCYS deputy administrator, who at the time of the Reports' submission was leading a sister agency of GCCYS, (*Id.* at ¶ 23-24);
- The protected activity was discussed in public meetings referenced in agendas, meeting minutes, and/or YouTube videos, (*Id.* at ¶ 23);
- Defendants recognized that the Reports were "weird" immediately upon receipt, (*Id.* at 46); and

- Defendants knew that each child identified in the Reports belonged to one of the School Board Plaintiffs, (*Id.* at ¶ 23).

It is reasonable to infer that Defendants had actual knowledge of protected activity relating to a matter of public knowledge and concern in their community, all the more so when the spouse of a former coworker was directly implicated. It is also reasonable to infer that, when confronted with unusual Reports that identified four members of the School Board as users of illegal drugs, Defendants connected the Reports to protected activity the School Board Plaintiffs had undertaken in their elected capacities. This is enough to raise a reasonable expectation that discovery will yield additional evidence of Defendants' actual knowledge. *Phillips*, 515 F.3d at 235.

Defendants' arguments to the contrary rely almost entirely on cases that were decided in the context of summary judgment or a directed verdict,[4] and the exceptions are distinguishable on their face. The retaliation claims in *Franty v. Fayette County Housing Authority*, Civil Action No. 22-1096, 2025 WL 949430 (W.D. Pa. Mar. 28, 2025), and *Cook v. Condo*, Civil Action No. 1:21-cv-361, 2023 WL 274506 (M.D. Pa. Jan. 18, 2023), were dismissed because the courts found the causal link between the protected activity and alleged retaliatory action to be speculative—an argument that Defendants have not made here, where Plaintiffs have pleaded that the retaliatory action took place within days of the School Board Plaintiffs' taking adverse employment action against the School District's business manager. (ECF No. 14 at ¶ 22). And *Falco*, 767 F. at 288, actually supports Plaintiffs' position that actual knowledge can be inferred at the pleadings stage. In that case, the City of Newark's former police chief appealed an order dismissing his First

---

[4] *Zucal*, 760 F. Supp. at 290 (summary judgment); *Ambrose*, 303 F.3d at 488 (directed verdict); *Eskridge*, 722 F. App'x at 296 (summary judgment); *Travillion*, 2025 WL 1401657 (summary judgment); *Moore*, 461 F.3d at 331 (summary judgment); *Weil*, 629 F. App'x at 262 (summary judgment).

Amendment claim against the city, its former mayor, and another former public official for retaliating against him for criticizing the former mayor and supporting her political rivals. *Id.* at 292. The Third Circuit partially reversed, holding that it could "reasonably infer" the defendants' knowledge of the protected conduct because the protected conduct involved "public activities." *Id.* at 313. So too here, where the protected activity involved School District finances that were matters of public knowledge and concern.

This Court thus should hold that Plaintiffs plausibly alleged that Defendants had actual knowledge of the protected activity.

### b.    Ms. Booker and Ms. Wiggins are not entitled to qualified immunity.

Qualified immunity is an affirmative defense that "will be upheld on a 12(b)(6) motion only when the immunity is established on the face of the complaint." *Thomas v. Independence Twp.*, 463 F.3d 285, 291 (3d Cir. 2006) (quoting *Leveto v. Lapina*, 258 F.3d 156, 161 (3d Cir. 2001)). In considering the affirmative defense of qualified immunity, the Court shall consider, in whatever order it finds most suitable, the following two inquiries: whether the defendant's conduct violated a constitutional or statutory right, and whether the constitutional or statutory right was clearly established. *Bayer v. Monroe Cnty. Children & Youth Servs.*, 577 F.3d 186, 191-92 (3d Cir. 2009). A right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 192 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

In their Motion to Dismiss, Defendants argue that the Supreme Court held in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), that public employees cannot bring a retaliation claim based on speech pursuant to their official duties because such speech is not protected under the First Amendment. (ECF 16, 12). Analogizing elected officials like the School Board Plaintiffs to public

employees, Defendants argue that it is not clearly established that elected officials have First Amendment protections from retaliation. (*Id.*). Defendants rely on a pair of Third Circuit decisions for this proposition, *Werkheiser v. Pocono Twp.*, 780 F.3d 172 (3d Cir. 2015), and *Willson v. Yerke*, 604 F. App'x 149, 151 (3d Cir. 2015).

In *Werkheiser*, the Third Circuit considered whether elected officials were entitled to qualified immunity when they retaliated against a fellow elected official by denying him reappointment to a non-elected office because of statements made in his capacity as an elected official. 780 F.3d at 174. Though acknowledging that the Supreme Court recognized a First Amendment retaliation claim brought by an elected official in *Bond v. Floyd*, 385 U.S. 116 (1966), the Third Circuit held that it was not clear after *Garcetti* whether the speech in question would receive First Amendment protection. 780 F.3d at 179. The Court accordingly granted the defendants qualified immunity. *Id.* at 174.

In *Willson*, the Third Circuit considered whether the district court properly entered summary judgment on an elected official's First Amendment retaliation claim against his fellow elected officials. 604 F. App'x at 150. The Third Circuit held that the insults and obscene gestures identified by the plaintiff would not deter a person of ordinary firmness from exercising free speech rights and, thus, failed to support a First Amendment claim as a matter of law. *Id.* at 151. The Third Circuit then noted in *dicta* that the defendants would also have been entitled to qualified immunity under *Werkheiser*. *Id.* at 152.

Notably, neither *Werkheiser* nor *Willson* provides the categorical immunity that Defendants claim here.[5] The Third Circuit in *Werkheiser* held that "the First Amendment may well

---

[5] Though acknowledging that the Court is bound by decisions of the Third Circuit, Plaintiffs reserve the right to argue that *Werkheiser* and *Willson* were wrongly decided. The Supreme Court held in *Bond* that "the rationale of [*New York Times v. Sullivan*, 376 U.S. 254 (1964)] disposes of

prohibit retaliation against elected officials for speech pursuant to their official duties only when the retaliation interferes with their ability to adequately perform their elected duties." 780 F.3d at 181; *accord Willson*, 604 F. App'x at 151. Moreover, a sister court within this district has held that the notion that "an elected official's speech is protected under the First Amendment is not a novel proposition." *Croft v. Donegal Twp.*, 2:20-cv-10430-CCW, 2021 WL 1146285, at *5 (W.D. Pa. Mar. 25, 2021). In addition to the Supreme Court's recognition of an elected official's First Amendment retaliation claim in *Bond*, the Third Circuit held in *Montiero v. City of Elizabeth*, 436 F.3d 397, 404 (3d Cir. 2006), that "[i]t is clearly established that when a public official excludes a[n] elected representative or citizen from a public meeting, she must conform her conduct to the requirements of the First Amendment." Elected officials thus have a clearly established right to be free from retaliation for expressive conduct made in their elected capacities where that retaliation would prevent them from taking office or speaking once in office. *Croft*, 2021 WL 1146285, at *5.

Moreover, a court in this district recently rejected a qualified immunity claim under similar facts to these. In *McClarnon v. Borough of Vandergrift*, Civil Action No. 20-779, 2022 WL 22684578 (W.D. Pa. Jan. 6, 2022) (Kelly, Magistrate J.), an elected official brought a First

---

the claim that [the elected official's] statements fell outside the range of constitutional protection." 385 U.S. at 136. Despite recognizing that "[t]he Supreme Court did not deem it necessary to address or revisit *Bond* in deciding *Garcetti*," *Werkheiser* nonetheless discarded *Bond* when it held that it is not clearly established post-*Garcetti* whether elected officials' speech is subject to First Amendment protection. *Werkheiser*, 780 F.3d at 179. This represents error in at least two respects. *First*, the Supreme Court has instructed that lower courts are "bound even by [its] crumbling precedents." *Loper Bright Enterp. v. Raimondo*, 603 U.S. 369, 406 (2024). *Werkheiser* accordingly overstepped when it declined to follow *Bond*, which provides a clear statement that elected officials will receive First Amendment protection for their official speech. *Second*, *Werkheiser* turned the qualified immunity analysis on its head by considering whether *Garcetti* eliminated, rather than established, a right to First Amendment protection for elected officials' official speech.

Amendment retaliation claim against her fellow elected officials, certain police department employees, and a private citizen. Following efforts to investigate governmental mismanagement, the plaintiff was subjected to law enforcement harassment involving threats, the unlawful detention of her husband during an extended traffic stop, and an assault and battery. *Id.* at *2. Distinguishing the collateral consequences and petty insults at issue in *Werkheiser* and its progeny, the court held that the defendants' actions were sufficient to interfere with rights, privileges, and responsibilities as an elected official so as to fall within the clearly established prohibition on First Amendment retaliation against elected officials under *Bond* and *Monteiro*. *Id.* at *6-7. The court accordingly denied the defendants' motion to dismiss for qualified immunity. *Id.*

This case is far more similar to *McClarnon* than *Werkheiser* or *Willson*. Unlike the denial of an unrelated appointed position in *Werkheiser* or the petty insults in *Willson*, Plaintiffs in this case were subjected to sham child-endangerment investigations in which their homes were searched and they were threatened with the removal of their children. (*See* ECF No. 14 at ¶¶ 26-45). These intrusions into the most private aspects of one's family life would deter even a person of extraordinary firmness from exercising the rights, privileges, and responsibilities of an elected official. And, indeed, the School Board Plaintiffs were uniquely susceptible to this form of retaliation where, by virtue of their responsibility for overseeing school-aged children, any allegations of child endangerment and illegal drug use would be particularly politically damaging, harmful, and chilling.

This Court thus should hold that Defendants have not established that Ms. Booker and Ms. Wiggins are entitled to qualified immunity from Plaintiffs' First Amendment claims.

    **2.**    **Plaintiffs have pleaded sufficient facts to support their claims against Ms. Booker and Ms. Wiggins.**

In § 1983 claims against multiple defendants, "a plaintiff must show that each individual defendant violated his constitutional rights." *Estate of Smith v. Marasco*, 430 F.3d 140, 151 (3d Cir. 2005). Arguing that Plaintiffs did not sufficiently allege the individual Defendants' personal involvement in the constitutional violations, Defendants contend that Ms. Booker should be dismissed from all claims and Ms. Wiggins should be dismissed from all but the Buchtans' and Smiths' Fourth Amendment claims. (ECF No. 16, 13-14). Defendants are again incorrect.

### a.   Plaintiffs have pleaded sufficient facts to support their claims against Ms. Booker.

Ms. Booker was the Administrator of GCCYS when the constitutional violations occurred. (ECF No. 14 at ¶ 6). Because of her supervisory role, Ms. Booker may be liable to Plaintiffs "if … she participated in violating [Plaintiffs'] rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in [her] subordinates' violations." *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Detention Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004). For the reasons discussed above, the Court may reasonably infer at the pleadings stage that Ms. Booker had actual knowledge of the protected activity underlying the First Amendment retaliation claim. The Court may similarly reasonably infer that Ms. Booker was aware that the Reports were false and retaliatory when she identified both the initial call submitting the Reports and the Reports themselves as "weird." (ECF No. 14 at ¶¶ 46 & 62). And where each GCCYS representative alleged to have engaged in the investigations, including the searches and seizures of Plaintiffs' homes and/or persons, would have been under Ms. Booker's supervision as Administrator, Plaintiffs have sufficiently alleged facts from which the Court may reasonably infer that Ms. Booker knew of and acquiesced in those representatives' violations. *See Abrantes v. Smith*, Civil No. 1:23-CV-01324, 2024 WL 3969685, at *3 (M.D. Pa. Aug. 28, 2024) (plaintiffs sufficiently pleaded a supervisory

liability claim against administrator of County Youth Services where allegations were that administrator personally directed violations)

This Court thus should hold that Plaintiffs have stated claims against Ms. Booker.

### b. Plaintiffs have pleaded sufficient facts to support the Buchtans' and Smiths' First and Fourth Amendment claims against Ms. Wiggins.[6]

Ms. Wiggins conducted a search of the Buchtans' and Smiths' homes and administered two drug tests to Mr. Buchtan. (ECF No. 14 at ¶¶ 27-30 & 37-38). Defendants do not contest that the Buchtans and Smiths have stated Fourth Amendment claims against Ms. Wiggins for this conduct. (*See* ECF No. 16). Defendants instead argue that Plaintiffs have not pleaded that Ms. Wiggins had knowledge of the protected activity underlying the Buchtans' and Smiths' First Amendment claims or that she took any action against them in retaliation. (*Id.* at 13). But, again, the Court may reasonably infer that knowledge for the reasons discussed above. Indeed, Plaintiffs have plausibly alleged facts supporting not only Defendants' knowledge of the protected activity, but also Defendants' knowledge that the Reports were false and retaliatory. (ECF No. 14 at ¶ 19-24).

The Court thus should hold that Plaintiffs have pleaded sufficient facts to support the Buchtans' and Smiths' First and Fourth Amendment claims against Ms. Wiggins.

### 3. Plaintiffs have pleaded sufficient facts to support the Smiths' Fourth Amendment claim.

To state a Fourth Amendment search and seizure claim, Plaintiffs must plead two elements: "(1) the actions of the [defendants] constituted a search or seizure within the meaning of the Fourth Amendment; and (2) the actions were unreasonably in light of the surrounding circumstances."

---

[6] As noted above, Plaintiffs do not oppose the dismissal of the Pratts' and Shuppes' First and Fourth Amendment claims against Ms. Wiggins only.

*Gagnon v. Marquez,* Civil Action No. 24-cv-5803, 2024 WL 4979269, at *2 (E.D. Pa. Dec. 4, 2024) (citing *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597-99 (1989)). "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Defendants do not contest these legal principles but rather argue that Plaintiffs have failed to allege that Defendants engaged in any search or seizure with respect to the Smiths. (ECF 16, 14-15). In doing so, Defendants have placed form above substance.

Plaintiffs pleaded that GCCYS representatives arrived at the Smiths' home where they interviewed Mrs. Smith for more than 60 minutes. (ECF 14 at ¶ 38). They then pleaded that the Smiths did not consent to the search of their home. (ECF 14 at ¶ 41). Though true that Plaintiffs did not expressly plead that GCCYS and/or its representatives searched the Smiths' home, that occurrence is reasonably implied by the foregoing allegations. And, were there any doubt that Plaintiffs have alleged that the Smiths were subjected to a search or seizure, Count II of the Second Amended Complaint states that "Plaintiffs were subjected to searches and/or photographing of their homes by Defendants in the course of the investigation of the false Reports." (ECF 14 at ¶ 69). Plaintiffs accordingly have pleaded sufficient facts for Defendants to identify the Smiths' Fourth Amendment claim and the facts on which it is based. No more is required. *See Blair v. City of Pittsburgh*, Civil Action No. 14-1473, 2015 WL 4162400, at *3 (W.D. Pa. July 9, 2015) ("[I]nartful pleading is not an appropriate basis of dismissal.")

The Court thus should hold that Plaintiffs have pleaded sufficient facts to support the Smiths' Fourth Amendment claim.

### 4.    Plaintiffs have pleaded sufficient facts to support a claim against GCCYS under *Monell*.

To state a claim against a municipality under *Monell v. Dep't of Social Servs. of City of N.Y.*, 436 U.S. 658 (1978), Plaintiffs must show: "(1) an underlying constitutional violation; (2) a

policy or custom attributable to the municipality; and (3) that the constitutional violation was caused by the municipality's policy or custom." *Hargrove v. City of Phila.*, 671 F. Supp. 3d 595, 605 (E.D. Pa. 2023). "A policy is created when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict, while a custom can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.* (cleaned up). GCCYS is treated as a municipality for purposes of *Monell*. *Hatfield v. Berube*, 714 F. App'x 99, 102 n.1 (3d Cir. 2017). Though Defendants contend that Plaintiffs must further demonstrate that GCCYS acted "with deliberate indifference to [the policy or custom's] known or obvious consequences," the case that they cite for that principle makes clear that is true only "[i]f … the policy or custom does not facially violate federal law." *Berg v. Allegheny Cnty.*, 219 F.3d 261, 276 (3d Cir. 2000).

In their Motion to Dismiss, Defendants contend that Plaintiffs fail to either identify a policy or custom of GCCYS or show how that policy or custom resulted in any violation of Plaintiffs' First or Fourth Amendment rights. Not so. Plaintiffs allege in Count I for First Amendment retaliation that "Defendants were acting pursuant to a policy or custom established by the GCCYS administrator, Ms. Booker, for the investigation of reports." (ECF No. 14 at ¶ 57). Plaintiffs then incorporate that allegation into Count II for Fourth Amendment violations and allege further that "Defendants were acting pursuant to a policy or custom set forth in a Urine-Drug Screening Policy created on or about November 14, 2022." (*Id.* at ¶¶ 64 & 66).

As the Administrator of GCCYS, Ms. Booker would have the final authority to set GCCYS policy. *Hargrove*, 671 F. Supp. 3d at 605. Moreover, whether the product of policy set by Ms. Booker or custom, Plaintiffs have pleaded sufficient facts from which the Court could reasonably

infer that the process employed by GCCYS for investigating complaints was "well-settled and permanent." *Id.* Plaintiffs' allegations concerning the investigations are broadly consistent: they allege that GCCYS representatives appeared at their homes (all Plaintiffs), interrogated them (all Plaintiffs), threatened to remove their children if the School Board Plaintiff did not submit to drug tests (all Plaintiffs), demanded to interview their minor children (Buchtans and Pratts), inspected their refrigerators and/or homes (all Plaintiffs), and took photographs (Buchtans, Pratts, and Shuppes). (*See* ECF No. 14 at ¶¶ 26-45). The causal link between the investigative process and the constitutional violations is obvious: Plaintiffs were subjected to sham child-endangerment investigations that involved warrantless searches of their homes and, in the case of Mr. Buchtan, the administration of two warrantless drug tests. Moreover, by directing warrantless searches and seizures, the policy or custom at issue here is unconstitutional on its face. *See Tenenbaum v. Williams*, 193 F.3d 581, 606 (2d Cir. 1999) ("[T]he Fourth Amendment's reasonable or probable cause and exigent circumstances doctrines apply to searches and seizures made in the course of child abuse investigations."); *Calabretta v. Floyd*, 189 F.3d 808, 814 (9th Cir. 1999) ("[T]he general law of search warrants applied to child abuse investigations."); *Kerns v. Chalfont-New Britan Twp. Joint Sewage Auth.*, 263 F.3d 61, 65 (3d Cir. 2001) ("It is settled law that the collection and analysis of a urine sample to test for drug use constitutes a search that is subject to the constraint of the Constitution's Fourth Amendment."). And, similarly, by failing to account for facially false and retaliatory child endangerment reports, the policy or custom exhibits "deliberate indifference to its known or obvious consequences"—here the disruption and anguish suffered by Plaintiffs and their families. *Berg*, 219 F.3d at 276.

In addition to the policy or custom for the investigation of reports discussed above, Plaintiffs also identified a specific Urine-Drug Screening Policy created on or about November

14, 2022 (the "Drug-Screening Policy"). (ECF No. 14 at ¶ 66). Plaintiffs are informed and believe that this Drug-Screening Policy established drug-testing requirements for child-endangerment investigations and, significantly, treated refusals as positive results justifying the removal of the subject's children. The causal link between the Drug-Screening Policy and the drug tests administered to Mr. Buchtan is obvious, as is the facial unconstitutionality of the Drug-Screening Policy. Not only is it settled law that urinalysis is subject to the Fourth Amendment's requirements, *see Kerns*, 263 F.3d at 65, but the Pennsylvania Supreme Court has expressly held that GCCYS and its sister agencies lack the legal authority to obtain involuntary urine samples, *Interest of D.R.*, 232 A.3d 547, 559 (Pa. 2020).

The Court thus should hold that Plaintiffs have pleaded sufficient facts to state a claim against GCCYS under *Monell*.

**C.    The Motion to Dismiss would not terminate this action**.

Though this Court should deny the Motion to Dismiss for the reasons set forth above, Plaintiffs do not challenge the Buchtans' Fourth Amendment claims against Ms. Wiggins and those claims would continue regardless of the Court's ruling.[7]

### CONCLUSION

**WHEREFORE**, Plaintiffs request that the Court enter an Order denying Defendants' Motion to Dismiss the Second Amended Complaint and granting such other relief as the Court deems just and proper.

---

[7] The prayer for relief in Defendants' brief and the proposed Order submitted with the Motion to Dismiss omit any reference to the Buchtans' and the Smiths' Fourth Amendment claims against Ms. Wiggins. (*See* ECF 15 & 16). Because Defendants include an argument in their Motion to Dismiss and brief for the dismissal of the Smiths' Fourth Amendment claims, however, Plaintiffs presume that omission of the Smiths' Fourth Amendment claims against Ms. Wiggins from the prayer for relief and proposed Order was an unintended omission.

Respectfully submitted,

BABST, CALLAND, CLEMENTS
and ZOMNIR, P.C.

Dated: March 4, 2026                  */s/ Joseph V. Schaeffer*
                                      Erin Lucas Hamilton (PA 93852)
                                      Joseph V. Schaeffer (PA 323256)
                                      Francesca Iovino, (PA 324229)
                                      Two Gateway Center, 8th Floor
                                      603 Stanwix Street
                                      Pittsburgh, PA 15222
                                      Phone: (412) 394-5400
                                      Fax: (412) 394-6576
                                      ehamilton@babstcalland.com
                                      jschaeffer@babstcalland.com
                                      fiovino@babstcalland.com

                                      *Counsel for Plaintiffs Albert Buchtan, Melinda
                                      Buchtan, Stephen Pratt, and Crystal Pratt*

                                      -and-

                                      METZ LEWIS BRODMAN MUST O'KEEFE LLC

                                      */s/ Joshua D. Baker*
                                      Joshua D. Baker (PA 308243)
                                      444 Liberty Avenue, Suite 2100
                                      Pittsburgh, PA 15222
                                      Phone: (412) 918-1100
                                      Fax: (412) 918-1199
                                      jbaker@metzlewis.com

                                      *Counsel for Plaintiffs Daniel Smith, Joey Lynn
                                      Smith, Jackie Shuppe, and Scott Shuppe*